UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 23-cr-153 (JDB) |
| v. : | |
| : | |
| DAVID BALL, : | |
| : | |
| Defendant. : | |

GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant David Ball to 36 months of probation with a condition of intermittent confinement totaling 21 days. The government also requests that the Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

I.   Introduction

The defendant, David Ball, a 38-year-old owner of a glass installation company who lives in Sanford, Maine, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Ball pleaded guilty to one count of Parading, Picketing, or Demonstrating in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(G). The government's recommended sentence for this offense is supported by (1) Ball's plainly unlawful entry into the Capitol through the Senate Wing Door minutes after it was broken open in the very first breach of the building that day, (2) his enthusiastic participation near the front of a large, hostile crowd as it confronted a small line of officers in the "Crypt" area of the Capitol, (3) his presence in that crowd as it overran that small group of officers to press deeper into the Capitol building, and (4) his statements on social media downplaying his culpability for his unlawful conduct that day.

The Court must also consider that Ball's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Ball's criminal conduct support a sentence of 36 months of probation with a condition of intermittent confinement totaling 21 days.

II.     **Factual and Procedural Background**

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. ECF No. 26 (Statement of Offense).

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

***Defendant David Ball's Role in the January 6, 2021 Attack on the Capitol***

On January 5, 2021, the day before the Joint Session of Congress was scheduled to convene to certify the Electoral College vote count, Ball traveled by car from his home in Sanford, Maine to Washington, D.C.

On the morning of January 6, 2021, Ball attended former President Donald Trump's "Stop the Steal" rally at the Ellipse area near the White House, where Ball heard another attendee yell through a megaphone to others present: "We are going to take the Capitol." When the crowd later began moving from the Ellipse toward the U.S. Capitol, Ball joined the crowd, eventually reaching the U.S. Capitol grounds and entering the fenced-off restricted perimeter established on the Capitol grounds that day. Ball wore all-black clothing, including a black baseball hat with an all-black American flag on the front, which he occasionally covered with a "Trump 2020" beanie, and a black hoodie with the name of his business, "Broken Glass Company," written on the back.



*Image 1: David Ball on U.S. Capitol grounds on January 6, 2021, after exiting the Capitol building (open-source video).*

Ball also carried a black flag featuring a skull and two short-barrel shotguns along with the text: "2nd Amendment - 1789 – America's Original Homeland Security."[2]



*Image 2: Flag carried by Ball inside U.S. Capitol building on Jan. 6, 2021*

After entering onto U.S. Capitol grounds, Ball approached the Capitol building from the west front, eventually reaching the West Plaza, where he saw rioters fighting with police attempting to defend the building from the amassing crowd. Ball then scaled the Northwest Stairs, passing underneath scaffolding constructed for the presidential inauguration later that month, which led him to the Senate Wing Door entrance on the northwest side of the Capitol building's first floor.

At approximately 2:13 p.m., rioters smashed out the windows on either side of the Senate Wing Door, climbed inside, and kicked the door open. This allowed a flood of rioters to pour into the Capitol building and forced the Senate and then the House to halt their proceedings shortly after. Ball entered the Capitol through the Senate Wing Door minutes after it was breached, at 2:20

---

[2] This flag was later obtained from Ball during his self-surrender and arrest in this case. Ball later told law enforcement that he purchased the flag from a Washington, D.C. street vendor on January 6, 2021 before entering the Capitol.

p.m. He saw shattered glass near the doorway as he entered, and he would have heard a loud alarm triggered by the breach. Ball knew when he entered the Capitol that he was not permitted to do so.

After entering through the Senate Wing Door, Ball turned south and walked toward the Crypt, a large circular room at the center of the building. By this time, a small group of U.S. Capitol police officers had responded to the Crypt to block the swelling crowd from breaching further into the building. Ball joined this loud, hostile crowd as it began pressing itself against the thin line the officers formed to block the rioters' path.



*Images 3 and 4: Ball and other rioters entering the Crypt, where USCP blocked their advance (Screenshots from Sent. Ex. 1 at 2:34 and 3:21).*

Ball worked his way through the crowd up toward the very front of it, to the point where it was stopped by U.S. Capitol police officers. Ball filmed on his smartphone in one hand, and in the

5

other he carried his black flag that read, "2nd Amendment - 1789 – America's Original Homeland Security."

During this period, from approximately 2:22 to 2:25 p.m., members of the crowd grew increasingly confrontational with the police officers stationed in the Crypt. *See* Sent. Ex. 2 at timestamp 2:04–4:54). At the front of the crowd, several rioters angrily confronted the officers, calling them "fucking traitors" and telling them to "let us through." Others, including Ball, chanted loudly toward the officers as a show of force—at times the crowd can be heard chanting "Whose house? Our house," "Let us through," and "U-S-A." Ball is shown in the photograph below chanting toward the officers, pumping his fist in the air holding his flag.



*Image 5: Ball in the Crypt of Capitol building near police line (Ball circled in red; flag in blue) (Screenshot from Sent. Ex. 2 at 2:04)*

At approximately 2:25 p.m., Ball and the other members of the crowd surged forward against the line of police officers in the Crypt. They quickly overwhelmed the grossly outnumbered officers, pushing the officers out of their way and filling the remainder of the Crypt. The crowd then pressed into an adjacent room toward the Memorial Door staircase, which led to the second floor of the building just outside former House Speaker Nancy Pelosi's office.



*Image 6: Members of crowd near Ball overrunning line of USCP officers in the Crypt at 2:25 p.m. (Screenshot from Sent. Ex. 3 at 0:10)*

From approximately 2:25 until 2:38 p.m., Ball remained with other rioters in the Crypt and its adjoining hallways despite knowing he was not permitted to be there. During this period, Ball recorded photo and video on his iPhone, carried his "2nd Amendment - 1789 – America's Original Homeland Security" flag, and continued to wear his "Trump 2020" scarf around his all-black American flag baseball hat. At 2:38 p.m., Ball exited the Capitol on the first floor through the Memorial Door entryway on the east side of the Capitol building.

### Post-January 6 Statements

Since January 6, Ball downplayed his culpability for his conduct on multiple occasions. On November 17, 2023, Ball wrote on X, formerly Twitter, under the username DaveBall32: "I

will be sentenced on January 9th for raising my hand and saying USA on that day in the capital building."



*Image 7: Screenshot of posts on X from November 17, 2023*

On November 18, the following day, Ball wrote that he was arrested "for going in the building, through open doors, not knowing what had happened before I got there[.]"



*Image 8: Screenshot of posts on X from November 18, 2023*

### ***Ball's Post-Plea Interview with FBI***

On December 6, 2023, pursuant to his plea agreement in this matter, Ball spoke with law enforcement about his participation in the breach of the U.S. Capitol on January 6, 2021.

Despite the alarms, chanting and aggressive shouting at the police, and the police line in the Crypt, Ball claimed in his interview that the police and the crowd were pleasant to one another

9

in the Crypt, and that he reportedly heard an officer state that it was okay that people were in the Crypt, but that they could not continue on into the building. This account runs counter to the violence Ball would have seen as he approached the Capitol, and open-source video showing Ball near the police line in the Crypt, where he and others can be seen chanting and shouting aggressively toward police (*see* pages 4-7, above).

### *The Charges and Plea Agreement*

On May 9, 2023, the United States charged Ball by a four-count information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On October 3, 2023, pursuant to a plea agreement, Ball pleaded guilty to Count Four of the information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

### III.   Statutory Penalties

Ball now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of sentencing Ball to 36 months of probation with a condition of intermittent confinement totaling 21 days.

## A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Ball's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Ball, the absence of violent or destructive acts is not a mitigating factor. Had Ball engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Ball's case is the timing and location where he breached the Capitol building. By entering through the Senate Wing Door at 2:20 p.m., Ball was close behind rioters who first breached the building minutes earlier. He followed the same path they did—entering the Capitol grounds from the west, crossing the West Plaza and climbing the Northwest Staircase—and this was a route replete with violence against police officers and other clear indications of the crowd's unauthorized, destructive presence on Capitol grounds. Ball saw shattered glass near the Senate Wing Door, and he would have heard a loud alarm blaring as he entered through the doorway.

Another important aspect of Ball's conduct is where he went immediately after entering the Capitol. Immediately after entering, he joined the swelling crowd in the Crypt that quickly grew hostile and confrontational toward the vastly outnumbered police officers in the room. He wove his way to the front of the crowd until he was just feet away from officers, then he joined the crowd loudly chanting at the officers as he pumped his fist. The crowd then overran the officers

11

and filled the remainder of the Crypt. Although Ball is not captured on video during the crowd rush, he was near the front of the crowd just minutes before the crowd's assault.

Finally, while Ball acknowledges that he violated the law that day, he has shown a troubling inability or unwillingness to appreciate the seriousness and wrongfulness of that conduct. As recently as November 2023, Ball stated that, "I will be sentenced January 9th for raising my hand and saying USA on that day in the capital building." When asked about this particular statement during his post-plea interview with law enforcement, Ball stated that he acknowledged the illegality of his conduct, but that federal law enforcement failed to apply such laws the same way to other civil disturbances and disruptive conduct at the Capitol. These statements demonstrate his failure to appreciate the extraordinary harm wrought by the violent mob on January 6, 2021. Thousands stormed the Capitol that day and drove to a halt for hours a joint session of Congress that had convened to fulfill a foundational duty in our country's democratic process. This is to say nothing of the innumerable ways the riot harmed the police defending the Capitol that day, the millions of dollars in damage done to the building, and the terror instilled in the members of Congress and staff trapped in the building that day. These things occurred because of the participation of Ball together with thousands of others. No other unauthorized gathering on Capitol grounds has come close to matching the scale and severity of damage caused by the riot on January 6. Even if Ball's description of his conduct accurately reflected the extent of his conduct—which it does not—it still evinces his failure to appreciate the uniquely consequential nature of the riot he chose to join that day.

Accordingly, the nature and the circumstances of this offense establish the clear need for a lengthy sentence of probation coupled with intermittent confinement.

### B. Ball's History and Characteristics

Ball operates a glass repair company based in Sanford, Maine and estimated his income at approximately $260,000 per year. He does not have a criminal history.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Although Ball has no criminal history, his conduct on January 6 and his statements to law enforcement demonstrate the need for specific deterrence best achieved through a substantial term of probation that includes intermittent confinement. While Ball has acknowledged that his conduct on January 6, 2021 was unlawful, he has not acknowledged that it was wrongful or that he regrets his actions separate from facing criminal liability for his conduct. And while Ball was cooperative with law enforcement during his post-plea interview, he minimized indications that he knew he was not permitted to enter or remain inside the Capitol building or that his and other rioters' conduct was highly disruptive and harmful to the critical business and security of the Capitol that day.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3] This Court must sentence Ball based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

14

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Frederick Webb*, Case No. 23-cr-225 (RCL), the defendant also pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like Ball, Webb entered the Capitol building through the Senate Wing Door before entering the Crypt area of the Capitol. Webb also joined in the crowd's loud, aggressive conduct inside the Capitol as Ball did, and he similarly minimized the wrongfulness of his conduct that day. But unlike Webb, who entered through the Senate Wing Door at 3:05 p.m., Ball entered at 2:20 p.m., just seven minutes after the initial breach. Webb did not arrive in the Crypt until long after police had been overrun by the initial crowd of rioters, but Ball was inside early enough to place himself near the front of that violent crowd. Judge Lamberth sentenced Webb, who had no criminal history, to 24 months of probation with 14 days of intermittent confinement.

This case is also comparable to *United States v. Brian Scott McGee*, Case No. 23-cr-96 (RDM), where the defendant also pled guilty to violating Section 5104(e)(2)(G). McGee entered the Capitol through the Senate Wing Door at 2:24 p.m., just four minutes after Ball breached the building through that same entrance. Both men saw fresh signs of the unauthorized breach—alarms blared, and Ball reported seeing shattered glass near the foot of the door—yet both chose to enter anyway. But unlike McGee, Ball continued deeper inside the Capitol, until he and others in the crowd were blocked by police officers from continuing further into the Capitol (until the crowd violently overran these officers). Both McGee and Ball were active on social media, though unlike

15

Ball, McGee used violent rhetoric in expressing his lack of remorse. Judge Moss sentenced McGee, a veteran of the U.S. Armed Forces with no criminal history, to 36 months of probation with 14 days of intermittent confinement.

Finally, this case is comparable in several respects to *United States v. Paul Modrell*, Case No. 23-cr-001 (BAH), where the defendant also pled guilty to one count of violating Section 5104(e)(2)(G). Modrell unlawfully entered the Capitol through the Senate Wing Door, having climbed through a broken window at 2:26 p.m. Like Ball, Modrell then walked to the Crypt in time to join the crowd as it overran the thin line of police officers attempting to prevent further access to the Capitol building. Modrell remained in the Capitol for a similar amount of time as Ball—25 minutes, compared to Ball's 18—though Modrell traveled further into the building, reaching the Rotunda and Senate Gallery Lobby before exiting. Both men downplayed the violence at the Capitol and the wrongfulness of their conduct when they later spoke to law enforcement. Judge Howell sentenced Modrell, a Navy veteran who also did not have a criminal history, to 36 months of probation with a condition of 90 days of home detention.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

16

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

V.      **Intermittent Confinement as a Condition of Probation**

As a condition of probation, a court may order that the defendant be incarcerated "during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(1); *see also United States v. Little*, 78 F.4th 453, 461 n.7 (D.C. Cir. 2023) (section 3563(b)(1) "contemplates *short* periods of confinement like 'nights' and 'weekends' interspersed throughout probation"). The statute was designed to give courts flexibility in the "fashioning of conditions of probation in order to make probation a useful alternative to a term of imprisonment." S. Rep. No. 98-225, at 59 (1983). Because Ball has pleaded guilty to a violation of 40 U.S.C. § 5104(e)(2)(G), a Class B misdemeanor, the statutory maximum of total confinement the Court may impose under § 3563(b)(10) is six months.

Judges in this district have imposed intermittent confinement as a condition of probation in many January 6 cases. *See*, *e.g.*, *United States v. Cameron*, 22-cr-17 (TFH), ECF No. 36 (D.D.C. Aug. 17, 2022) (imposing 30 days of confinement in three-day intervals as condition of three years of probation); *United States v. Vuksanaj*, 21-cr-620 (BAH), ECF No. 43 (D.D.C. Apr. 29, 2022) (imposing 42 days of confinement in 14-day intervals as condition of three years of probation). While the statute refers to multiple intervals, a single short interval is also permissible. *See*, *e.g.*, *United States v. Valentin*, 21-cr-702 (JEB), ECF No. 65 (D.D.C. July 17, 2023) (imposing single 10-day interval of confinement as condition of 12 months of probation); *United States v. Escalera*, No. 22-cr-364 (APM), ECF No. 36 (D.D.C. Aug. 8, 2023) (imposing single seven-day interval as

condition of two years of probation); *see also* S. Rep. No. 98-225, at 99 (noting that statute was intended to permit a single "brief period of confinement").

Here, a condition of intermittent confinement totaling 21 days is sufficient, but not greater than necessary, to serve the purposes of sentencing under 18 U.S.C. § 3553(a)(2).

### VI.     Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Ball must pay $500 in restitution, which reflects in part the role Ball played in the riot on January 6.[5] Plea Agreement at ¶ 11. As the plea agreement reflects, the

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can

riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Ball's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant David Ball to 36 months of probation with a condition of intermittent confinement totaling 21 days. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Ball's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   s/ *Hutton Marshall*
J. Hutton Marshall
Assistant United States Attorney

---

be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).