## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v.                                                       ) | Criminal No. 1:23-CR-153-JDB |
| ) | |
| **DAVID BALL JR.,**                           ) | |
| ) | |
| *Defendant.*                            ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

**I.     INTRODUCTION**

David Alan Ball, Jr. comes before this Court humbled, contrite, and extraordinarily remorseful for his actions on January 6, 2021 (hereinafter "January 6") following his acceptance of responsibility upon entering a plea of guilty to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By and through undersigned counsel, Mr. Ball respectfully submits this Memorandum in Aid of Sentencing.

Based upon his personal history and characteristics, the nature and circumstances of the offense, his lack of criminal history, the miniscule likelihood of recidivism, and the need to avoid unwarranted sentencing disparities, counsel respectfully requests that the Court impose a non-custodial sentence, as such a sentence would be "sufficient, but not greater than necessary," to achieve the legitimate purposes of sentencing. *See* 18 U.S.C. § 3553(a).

Specifically, counsel requests that the Court impose a short period of probation that would be terminated upon the payment of a fine and the completion of community service by Mr. Ball. Mr. Ball seeks to limit the period of probation for several reasons. He has already been on pretrial release for ten (10 months) and has been completely compliant. As well, Mr. Ball is attempting to

1

become a registered Maine Guide, where he will guide clients on hunting and wildlife trips throughout Maine. This job would require him to carry firearms and being on probation would significantly hinder this endeavor. Additionally, continuing to comply with probation for years to come would significantly hamper his ability to care for his son, who has a serious medical condition, who benefits physically by hunting with his father. Further, the stress on his family is significant, especially considering his wife is currently pregnant. For instance, a probation officer recently made an unannounced to Mr. Ball's home, when two of his children were napping; the supervision causes uneasiness and worry in his home.

## II.     MR. BALL'S BACKGROUND

Mr. Ball is a thirty-eight (38) year old husband and father of five children, with another child on the way.  *See* Presentence Investigation Report (hereinafter "PSR") at ¶ 37.  He lives in Sanford, Maine and has lived in Maine for most of his life.  *Id*. at ¶ 38.  Although he got divorced and remarried within the past couple of years, he maintains a good relationship with his first wife and remains involved with the children he had with her, financially supporting them through his business. *Id*. at ¶ 36.  One of his children has a serious medical condition that requires constant monitoring and care.  *Id*. at ¶ 35.

Mr. Ball was raised by supportive and loving parents.  *Id*. at ¶ 34.  According to Mr. Ball, as children, he and his siblings "didn't have a lot but we had what we needed."  *Id*.  When he was in third grade, Mr. Ball suffered a terrifying and traumatic event at the hands of his stepbrother, who was thereafter removed from his home after young Mr. Ball worked through his immense fears and reported the event to his parents.  *Id*. at ¶ 33.  Mr. Ball received counseling as a result. *Id*.

Mr. Ball did not graduate high school, in part because he was working and supporting himself during that time. *Id*. at ¶ 42. However, he eventually earned his GED at Robert William Traip Academy in Kittery, Maine in 2004. *Id*. He got his first job as a mover when he was a teenager and kept working jobs until he found his way into the glass trade. *Id*. at ¶¶ 43-45. In 2018, Mr. Ball founded his own glass company, and he employs many people, including his father. *Id*. Mr. Ball spends "99%" of the time he gets away from work with his wife and kids. *Id*. at ¶ 37.

Mr. Ball's close family and friends describe him as a hardworking man of integrity who puts his values into action. *See* Exhibits A-K. Sacrificing time and money to help those in need comes naturally to him. *Id*. He is a family man who is actively involved in his children's lives, and he treats his employees with respect and decency. *Id*. Those who know him best describe his actions on January 6 as an aberration and "mistake" in an otherwise good man's life. *Id*.

### III.   THE LEGAL FRAMEWORK OF A SENTENCE

In fashioning a sentence, the Court must "consider all of the § 3553(a) factors . . . make an individualized assessment based on the facts presented," *Gall*, 552 U.S. at 49-50, and explain how the facts relate to the purpose of sentencing. *Id*. at 53-60; *see also Pepper v. United States*, 562 U.S. 476 (2011). The Court's "overarching duty" is to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Pepper*, 562 U.S. at 493 (internal quotations omitted).

Additionally, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the

3

punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Pepper*, 562 U.S. at 488 (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In this regard, "the district court's job is not [even] to impose a reasonable sentence. Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2)." *United States v. Forman*, 436 F.3d 638, 644, n.1 (6th. Cir. 2006). Accordingly, "if a district court were explicitly to conclude that two sentences equally served the statutory purpose of § 3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2nd Cir. 2006).

### IV. APPLICABLE U.S. SENTENCING GUIDELINES RANGE

The parties agree that the U.S. Sentencing Guidelines do not apply in this case. *See* U.S.S.G. § 1B1.9; *see also* PSR at ¶ 25. Further, Mr. Ball does not have a criminal history computation for sentencing purposes because the sentencing guidelines do not apply to any count of conviction that is a Class B or C misdemeanor or an infraction. *Id*. at ¶ 28. However, Mr. Ball does not have any prior juvenile adjudications, adult criminal convictions, pending charges, prior arrests, or any prior other criminal conduct. *Id*. at ¶¶ 26-31. As to count four, the maximum term of imprisonment is six months. *Id*. at ¶ 48. Because this offense meets the definition of a "petty offense," a term of supervised release is not applicable. *Id*. at ¶ 52. Mr. Ball is eligible for up to five years' probation because the offense is a misdemeanor. *Id*.

### V. 18 U.S.C. § 3553(a) FACTORS

A.     **The Nature and Circumstances of the Offense**

Mr. Ball's conduct and involvement in the instant offense is beyond regrettable. In his letter to the Court, Mr. Ball says the word "sorry" does not begin to describe how he feels about the eighteen (18) minutes he spent in the Capitol Building on January 6, 2021. *See* Exhibit A; *see also* PSR at ¶¶ 10-13. Even though he remained non-violent and did not cause damage while inside the Capitol, he knew upon entering the building that he was not permitted to do so. *See* PSR at ¶ 10. Mr. Ball admits, January 6 was "so damaging to not only all of us as a nation, but also on the world stage." *See* Exhibit A. He laments, "I can't imagine how the families of the people working in that building must have felt that day watching the events unfold…Daughters, sons, mothers, fathers, aunts, uncles all wondering if their loved one was going to make it home safe that night…Absolutely unforgivable." *Id*.

Mr. Ball went to the former President's rally on January 6, 2021 thinking that visiting the "amazing city where the country I am so proud of was formed" would be a fun thing to do before his wife delivered their next baby and he came under the usual stress of caring for a newborn. *Id*. He recognizes that although his original purpose for visiting Washington, D.C. that day was not to commit a crime, he says, "I fully own that I was part of that power in numbers w[hether] I knew it or not." *Id*. He confesses, "[i]t kills me to know that I had even a small part in controlling the fear those innocent people experienced." *Id*. He tells this Court, "I agree that the severity of my offen[s]e warrants punishment." *Id*.

Mr. Ball describes how his actions on January 6 not only caused harm to this nation, but also to his family, friends, business, and himself. *Id*. "I've found myself unable to perform daily tasks because my mind and heart just won't allow me to stop thinking about how much this has

5

affected everyone I love." *Id*. Because of his actions, his daughter was traumatically pulled out of class by teachers and questioned, his son went through the agonizing experience of seeing his dad in trouble on the news, his wife has suffered the embarrassment of being questioned by peers about her marriage and personal life, and his beloved sister almost refused to speak to him. *Id*.

He has the "constant feeling of shame" and feels like his community hates him, causing him to fear for his and his family's safety. *Id*. He received phone calls calling for him to be hung on the street and tried for treason. *Id*. His business' reputation was negatively affected by damaging online reviews left by people who believe he is an insurrectionist. *Id*. Additionally, because of his choices on January 6, he is not the same man he used to be. *Id*. "I've lost my spark." *Id*. Because of his actions on January 6, Mr. Ball suffers from crushing regret, shame, and anguish and has already received the punishment of public shaming, with another round of public shaming likely still to come after his sentencing.

### B. Mr. Ball's Personal History and Characteristics

Mr. Ball is loved and admired for his hard work and kindness towards others, as evidenced by numerous letters of support submitted on his behalf. *See* Exhibits A – K.

David Ball, Sr. is the "proud father" of Mr. Ball. *See* Exhibit B. He describes his son as "a soft spoken family man who rarely raised his voice or gets angry." *Id*. According to Mr. Ball, Sr., when his son is not working, he is telling bedtime stories to his kids, going to school plays, or attending his kids' sporting events. *Id*. He highlights how Mr. Ball employs eight individuals and that he is "always kind and understanding when anyone makes a mistake." *Id*. His father describes his son as a hard worker that "has worked day and night for seven long years to grow

his business." *Id*. He knows his son to be generous, "often doing work at reduced prices or even for free." *Id*. "David has helped many people." *Id*.

Mr. Ball, Sr. describes his son as "very remorseful" for his "very uncharacteristic" actions on January 6, which is evidenced by how hard Mr. Ball has been on himself. *Id*. According to his father, Mr. Ball is "withdrawn," his "bright smile is missing," and it is "hard to hold a conversation for more than 3 minutes." *Id*. His son has told him "many times" that his involvement was "not the right thing to do." *Id*. Mr. Ball, Sr. feels that his son is a "good" person who "made a mistake." *Id*.

John Moody has been a friend of Mr. Ball's for almost twenty (20) years. *See* Exhibit C. Mr. Moody describes how Mr. Ball saved his life when he took him into his home and cared for him when he was at death's door during the lowest point of his drug addiction. *Id*. By that point, they had been friends for years and Mr. Ball had seen him in active addiction, stealing from others and getting in trouble with the law multiple times. *Id*. After a serious overdose almost took Mr. Moody's life, instead of giving up on him, Mr. Ball took him into his home and got him connected with a methadone clinic. *Id*. For months, Mr. Ball would wake Mr. Moody up every morning to get him to the clinic and gave him a job to keep him busy. *Id*. "[W]ithout Dave in my life I wouldn't be alive today." *Id*. Regarding Mr. Ball's actions on January 6, Mr. Ball has told Mr. Moody "so many times he wishes he had never went." *Id*. Mr. Moody has seen that Mr. Ball has not been the same person since his arrest. *Id*. Mr. Moody asks this Court to give Mr. Ball another chance at life, just as Mr. Ball gave Mr. Moody another chance at life years ago. *Id*.

Tara Ball, Mr. Ball's wife of two years and the mother of two of his children (she is pregnant with their third), describes him as a an "amazing husband and father" who is "honest,

7

caring, attentive and incredibly patient to his entire family." *See* Exhibit D.  To Ms. Ball, her husband's participation in January 6 was "so out of character" for someone who is a "man of integrity."  *Id*.  "[T]he regret runs deep."  *Id*.  Ms. Ball describes her husband as a great dad, like how he has "stepped up" and taken care of her son from a previous relationship, taking him to practices and games with zero notice.  *Id*.  He is the kind of person who would "take care of anyone in need because that's just what he does."  *Id*.  Ms. Ball has witnessed him go out of his way to take care of friends, family, acquaintances, and even strangers "more times than can be counted."  *Id*.  She says Mr. Ball is charitable, providing pro bono work for members of the community and veterans and donating to many charities and individuals, "sometimes without taking the credit."  *Id*.  Ms. Ball describes him as "always striving to do better."  *Id*.  Ms. Ball describes how he has beat himself up over this mistake and "taken this to heart."  *Id*.

Matt Hensel is Mr. Ball's good friend and a fellow business owner.  *See* Exhibit E.  These criminal charges were a "big surprise" to Mr. Hensel, who describes Mr. Ball as "the guy that would literally help anyone."  *Id*.  Mr. Hensel feels these charges were "opposite" of who Mr. Ball truly is, saying, "I've never known Dave to be in trouble or break the law."  *Id*.  Mr. Hensel knows him to be "the most loving, loyal and amazing husband to his wife" and a "true family man."  *Id*.  According to Mr. Hensel, although these charges have broken Mr. Ball down mentally, Mr. Ball has "learned from this whole thing."  *Id*.  Mr. Hensel notes that Mr. Ball has "grown stronger" and "has become a little more humble" due to these charges.  *Id*.

Crystal Ball is Mr. Ball's sister and the eldest of the siblings.  *See* Exhibit F.  Although she is "strongly against the events that took place" on January 6, she wrote her letter to this Court to speak to her brother's character.  *Id*.  "Mr. Ball is a good, caring man who made a very poor

decision." *Id*. Mr. Ball is a "family man, first and foremost." *Id*. Ms. Ball states her brother has "shown up" for her on more than one occasion, stating, "he's taken care of me when I wasn't able to take care of myself." *Id*. "Mr. Ball is a caregiver, to family, friends, and even strangers." *Id*. She also thinks he is a "hard worker, owning his own business, building it from the ground up into a success, enabling him to support his wife and children." *Id*. Ms. Ball believes her brother when he told her that he went to Washington, D.C. that day "only to hear the President speak." *Id*. Although he "got caught up in the events" that day, she believes if he were faced with the same situation again, "Mr. Ball's decision would not be the same." *Id*. She believes "he has certainly learned from his choices that day" and he has "shown remorse" when speaking with her. *Id*. This situation "has made him an even better man." *Id*.

Brenda Ball is Mr. Ball's mother. *See* Exhibit G. She says that "David has always been a great person." *Id*. Ms. Ball explains that her son is well respected by his community and is one of the kindest people she knows. *Id*. "Family is everything to him." *Id*. Oftentimes her son will drive to her house almost an hour away simply to help her with something. *Id*. "Everyone loves David because of the person he is" and "[h]e would give the shirt off his back to anyone in need." *Id*. Ms. Ball believes her son when he says he wishes he had never gone to the Capitol Building on January 6. *Id*. She states, [h]e has never done anything like this" and he "got caught up in the moment and didn't know how to get out of it." *Id*. Ms. Ball believes her son would not make this same mistake again if given the opportunity. *Id*.

Laurence Plotkin is Mr. Ball's friend and a fellow business owner. *See* Exhibit H. Mr. Plotkin believes Mr. Ball's behavior on January 6 was "out of character and would not be repeat[ed]." *Id*. He describes Mr. Ball as an "intelligent and thoughtful person" who has been

9

"honest, forthright, and fully responsible" in their many business dealings together. *Id*. He witnessed Mr. Ball take great pride in his ever-expanding business and family, acting "professionally and compassionately with his co-workers, family, and friends." *Id*. When Mr. Ball encounters challenging situations in his business dealings, Mr. Plotkin sees him as "inquisitive and wholly interested in creating the best possible outcome for all parties." *Id*. Thus, Mr. Plotkin was "disgusted and surprised" upon hearing of Mr. Ball's involvement in January 6 and considered his involvement "total stupidity." *Id*. However, after speaking with Mr. Ball and "thoroughly investigat[ing]" Mr. Ball's perspective, Mr. Plotkin feels Mr. Ball is remorseful and "truly regrets being caught up in something he doesn't even seem to feel passionate about." *Id*. "His curiosity got the best of him." *Id*. To Mr. Plotkin, this "was an error in an otherwise relatively simple life." *Id*.

Thomas Kinney, a former police officer of ten (10) years, is Mr. Ball's friend and has worked with him professionally as well. *See* Exhibit I. Mr. Kinney describes Mr. Ball as "ambitious" and always willing to help and tells of the high quality and professionalism Mr. Ball brings to his work. *Id*. Mr. Ball's business is the "go to" business within the community, not only because of the quality of his work, but also because of "the type of person he is." *Id*. Mr. Kinney states, "I believe Mr. Ball's business has flourished because of the character he exhibits as a person." *Id*. Mr. Kinney was "shocked" when Mr. Ball called him to inform him of his actions on January 6, especially since "Mr. Ball has done nothing short of exemplify[] moral integrity throughout the years." *Id*. Mr. Kinney believes Mr. Ball is remorseful and that in taking responsibility for his actions, he will "continue to be a productive member of society." *Id*.

10

Robert Rolfe has been friends with Mr. Ball for roughly twenty-five (25) years. *See* Exhibit J. Mr. Rolfe describes Mr. Ball as a person who "greets strangers in public with compliments" and has a way of "put[ting] a smile on someone's face that he doesn't even know." *Id*. He says, "David Ball is the kind of person we should all strive to be." *Id*. One time, Mr. Rolfe and his family found themselves without a working vehicle, and Mr. Rolfe was having trouble securing a loan for a new car. *Id*. Mr. Ball caught wind of this and loaned Mr. Rolfe money so that he could get a used vehicle. *Id*. According to Mr. Rolfe, Mr. Ball's business is thriving because "he puts the same love and effort into his business as he does with his family, friends, community and strangers." *Id*. Regarding Mr. Ball's actions on January 6, Mr. Rolfe has seen that this situation scares Mr. Ball and that he feels "huge regrets and remorse for his actions." *Id*. Mr. Rolfe mentions that Mr. Ball "has no violent bone in his body" and "the upmost respect for law, law enforcement and all other first responders." *Id*. Mr. Ball has told Mr. Rolfe that he "felt disgusted with himself and how sorry he was." *Id*. "He never wants to be in this kind of situation again." *Id*.

Peter Jordan is Mr. Ball's friend of over fifteen (15) years and former colleague. *See* Exhibit K. Years ago, Mr. Ball was an apprentice of Mr. Jordan's. *Id*. Mr. Jordan describes Mr. Ball as "reliable," "dependable," and "honest." *Id*. When Mr. Ball was a foreman at their previous employer, Mr. Jordan witnessed him be good to everyone on his team and everyone liked working with him. *Id*. Mr. Jordan describes Mr. Ball as a "generous man" who is "especially caring about his children." *Id*. Mr. Ball's son, Noah, has a serious medical condition, and Mr. Jordan has seen how Mr. Ball supports his son "with amazing strength and love." *Id*. Mr. Jordan describes how Mr. Ball reached for bigger goals when he started his own glass

11

company in Maine. *Id*.  Mr. Ball employs several people, including Mr. Ball's own father, and he is a "very supportive and caring employer and friend." *Id*.  Mr. Jordan is "convinced that this situation is a once in a lifetime mistake" and "he did not mean to harm anyone or anything." *Id*. "Curiosity" led Mr. Ball to the Capitol that day, and Mr. Jordan feels that Mr. Ball is "deeply" regretful for his actions.  *Id*.

In sum, Mr. Ball is beloved by his family, friends, and coworkers.  All who are close to him believe in his goodness, and that this lapse of judgment is not indicative of how he has lived his life.  Furthermore, everyone is confident that he will never again be before the Court, and they cannot wait for his full return to life.

        **C.**      **Mr. Ball Poses Little or No Risk of Recidivism**

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured.  Fortunately, Mr. Ball does not fit the archetype of a person who will commit new criminal offenses or recidivate.  And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "[t]here is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended nor designed to predict recidivism." U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter

12

*Measuring Recidivism*). Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C). Accordingly, in *United States v. Booker* the Supreme Court freed the judiciary to remedy this inconsistency. *See* 543 U.S. 220 (2005).

In addition to what has already been described about Mr. Ball's character demonstrating his ability to reform, the Commission has also objectively quantified his low likelihood of recidivism. For example, the Sentencing Commission's study confirms that recidivism rates decline relatively consistently as age increases. *See Measuring Recidivism* at 12. With respect to Mr. Ball, who is thirty-eight (38) years old, defendants between the ages of 36 to 40 with no criminal history points have a recidivism rate of only twelve-point-one percent (12.1%). *Id.* at 28.

Other findings by the Commission support the conclusion that Mr. Ball will not commit a criminal offense in the future. For example, defendants with no criminal history points who are either legally married or divorced, like Mr. Ball who has been both divorced and married, have only a nine-point-eight percent (9.8%) recidivism rate. *Id*. at 29. Additionally, defendants with no criminal history points who have obtained a high school diploma, like Mr. Ball who has obtained his GED (a high school degree equivalency), have only a ten-point-six percent (10.6%) recidivism rate. *Id*. The Commission has also found that first offenders like Mr. Ball are rarely reconvicted of a crime. In fact, only 2.5% of first offenders with zero criminal history points and zero prior arrests are ever reconvicted. U.S Sentencing Comm'n, *Recidivism and the First Offender* at Exhibit 6 (May of 2004). There is, quite simply, nothing in the record to make this Court reasonably believe that Mr. Ball would commit any criminal offense in the future.

Beyond the statistics, Mr. Ball personally presents no risk of recidivism. As detailed by his family and friends, Mr. Ball has lived his entire life guided by principles completely

13

incongruous with his actions on January 6. As shocked as those closest to him were by his arrest, no one was more devastated than Mr. Ball himself. Although he feels crushing shame and guilt for his actions, he has kept his focus on raising his children, strengthening his relationship with his wife, and improving his business, even in the wake of the public ridicule he and his business have endured.

Through countless difficult conversations with his family and friends, and through personal reflection, Mr. Ball confronted head-on what led him to be present in the Capitol on January 6 and is certain he will never put himself in such a situation again. Moreover, regardless of the sentence imposed by this Court, Mr. Ball has already faced devastating consequences as a result of his actions and arrest. His professional and personal life are forever changed, and his actions on January 6 will remain a dramatic aberration in an otherwise exemplary life of service to his family and community. As such, a non-custodial sentence is appropriate to serve as an adequate deterrent to Mr. Ball and protection for the public.

### D. The Need to Avoid Unwarranted Sentencing Disparities

An additional factor to consider is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). This factor has become especially important in January 6 cases.

This Court is well versed in the now eighty-three (83) page sentencing comparison chart of all January 6 defendants.[1] For sake of brevity and to focus the Court's attention, Mr. Ball asks the Court to consider cases in which this Court already imposed sentences. Each contains important facts that distinguish Mr. Ball's conduct and supports a non-custodial sentence.

---

[1] Available at https://www.justice.gov/usao-dc/capitol-breach-cases.

In no way minimizing Mr. Ball's conduct, it is important to note that Mr. Ball's actions that day are on the extremely low end of the spectrum of January 6 defendants. Mr. Ball entered the Capitol for approximately eighteen (18) minutes, between 2:20 p.m. and 2:38 p.m. He walked through the Senate Wing Doors and made his way to the Crypt, where the situation began to escalate. He took photos and video with his phone while walking around and chanting with the crowd – he then eventually exited the building. Mr. Ball did not engage in any acts of violence, nor did he engage in any destruction of property.

In *United States v. Jordan Bonenberger*, the government asked for fourteen (14) days of intermittent confinement, 36 months' probation, 60 hours of community service, and a $500 fine. This Court sentenced Mr. Bonenberger to eighteen (18) months' probation, 50 hours of community service, a $2,000 fine, and $500 restitution. *See* 22-cr-102. Mr. Bonenberger's conduct included entering the Capitol for approximately nineteen (19) minutes, nearly identical to the length Mr. Ball remained inside, and walking around through the Rotunda and a corridor on the Third Floor. *See id.*, at Dkt. No. 53. There is no indication that Mr. Bonenberger engaged in any acts of violence or destruction of property, just like Mr. Ball.

In *United States v. Nathan Pelham*, the defendant entered the Senate wing doors and stayed within fifteen (15) feet of that door for the approximately eight (8) minutes that he remained inside. *See* 23-cr-150, Dkt. No. 14. The government requested six (6) months incarceration, 60 hours of community service, and $500 restitution; the Court imposed only the $500 restitution.

Friends Brandon Nelson and Abram Markofski both entered the Capitol at approximately 2:16 p.m., walked around, took photos and videos, texted others about what was happening, and it appears via the Statement of Facts that they remained in the Capitol for over an hour and a half,

exiting at approximately 3:40 p.m. *See* 21-cr-344, Dkt. No. 41. The government requested a sentence of fourteen (14) days incarceration and $500 restitution; the Court imposed a sentence of 24 months' probation, a $2,500 and $1,000 fine respectively, 50 hours community service, and $500 restitution.

A non-exhaustive list of other examples where the government requested a sentence of incarceration, but the Court imposed a sentence of probation with community service and a fine include the following:

- Fee, Thomas – 1:21-CR-00133-JDB (sentenced to 24 months' probation, $500 fine, $500 restitution, and 50 hours' community service)
- Tagaris, Jody – 1:21-CR-00368-JDB (sentenced to 24 months' probation, $2,000 fine, $500 restitution, and 60 hours' community service)
- Buxton, Jonas – 1:21-CR00739-JDB (sentenced to 18 months' probation, 40 hours' community service, $500 fine, and $500 restitution)
- Archer, Melanie – 1:22-CR-00102-JDB (sentenced to 18 months' probation, 50 hours' community service, and $500 restitution)

### E. Mr. Ball's Public Demise is Adequate Deterrence to Others

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." There is no need for personal deterrence in this case, as Mr. Ball endured severe ridicule and threats from his community, both in person and on the phone, because of his actions on January 6. He witnessed his family suffer because of his actions, and he had to restructure his business and change its name due to the public shaming. Furthermore, Mr. Ball is not the type of person who would commit any further crimes in the future.

Mr. Ball has no criminal history or prior arrests, and this experience has been a defining moment in his life.

Arguably, the government already substantially achieved the maximal deterrent effect of Mr. Ball's offense simply by charging and convicting him. As a result, numerous media outlets will discuss Mr. Ball and the substance of his offense, as they have done in the past. Further, Mr. Ball will be discussed in various conversations and settings among family and friends and within certain professional environments for years to come, a shameful reality from which he simply cannot escape. In short, Mr. Ball's public and professional demise sends a strong message to anyone who might attempt such conduct in the future.

## VI.　CONCLUSION

In light of the above, Mr. Ball respectfully requests that the Court impose a non-custodial sentence.

Respectfully submitted,

_____/s/_____
David Benowitz
D.C. Bar No. 451557
Rammy G. Barbari
D.C. Bar No. 1032106
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
(202) 417-6000
David@PriceBenowitz.com
Rammy@pricebenowitz.com

*Counsel for David Ball*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 3rd day of January 2024, I caused a true and correct copy of the foregoing Defendant's Memorandum In Aid of Sentencing to be delivered via CM/ECF to all parties in this matter.

_____/s/_____
David Benowitz
Rammy G. Barbari